# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br><br> v. <br><br> ROBERT DEWAIN VENSON. <br><br> Defendant. | Action No. 08:09–cr–00088—AW |

## MEMORANDUM OPINION

This Memorandum Opinion sets forth, fully explains, and supplements the findings, conclusions, and determinations made by the Court at the January 19th, 2011 sentencing hearing. The Court was in the middle of a four week trial and conducted this sentencing hearing commencing around 4:00 PM at the end of the trial day on January 19th, 2011 and concluding around 5:30 PM. While the Court permitted the parties to make their full presentations, because of the lateness of the hour the Court did not state all of its comments it wanted to make prior to making its determinations and findings.

**I**

As the parties are aware, in sentencing a defendant per *United States v. Booker*, 543 U.S. 220 (2005), the District Court must: (1) make the appropriate findings of fact (ruling on the objections and issues in dispute), then determine the guideline range as recommended by the sentencing guidelines; (2) determine whether a sentence within that range and within the statutory limits serves the factors set forth in 18 U.S.C. section 3553 (a) and, if not, select a sentence that does serve those factors; (3) implement any applicable mandatory statutory

limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining/articulating why a sentence outside the Sentencing Guideline range (particularly explaining any departure or variance) better serves the relevant sentencing purposes set forth in 3553(a). The Court need not discuss each factor set forth in 3553 (a) in a checklist fashion as it is enough to calculate the range accurately and explain why (if the sentence lies outside of it) the particular defendant deserves more or less.

Under 18 USC §3553 (a), the district court must ensure that the sentence it imposes fulfills the congressionally established objectives for sentencing, including: (1) Punishing the defendant in light of the seriousness of the offense so as promoting respect for the law and providing just punishment for the offense; (2) affording adequate deterrence (to deter both the defendant and others) from criminal conduct; (3) incapacitating the defendant and thus protecting the public from further criminal activity of the defendant; and (4) rehabilitating the defendant with needed educational or vocational training, medical care, or other correctional treatment; and (5) providing restitution to victims and avoiding unwarranted sentencing disparities.

## II

The Court presided over the trial in this case and now summarizes pertinent testimony and provides the Court's impressions, drawn from the Court's recorded reflections, as to what the evidence before the jury portrayed. Essentially, the Defendant unlawfully extracted and distilled inflated equity out of the real estate properties involved in this case. The lenders loaned more money than the properties were worth, and the Defendant took cash out and had the cash paid to either Immanuel, LLC or Compassionate Real Estate Company. The evidence further reflected that after negotiating for one price on the properties with the sellers, the Defendant caused the HUD I and other paperwork to reflect an increased sales price. In most of the

transactions, the Defendant also used a straw buyer (undisclosed to the sellers) to actually purchase the property. Directed by Defendant, the straw purchaser was to meet or contact a loan officer one of whom was Rasheeda Canty, a co-conspirator who "doctored up" the financial application of the straw buyer by inventing job titles; fraudulently misrepresented the salaries of the straw-buyer (stated incomes were represented in some instances as $9,000-$12,000 per month); and sent "bogus" letters about the relocation of a straw buyer's job and a "bogus" letter verifying rental payment. All of these representations were lies. Some straw buyers were told to make sure they stated that they were going to live on the property, a blatant misrepresentation. Most of the straw-buyers were then told to just show up at settlement and sign paperwork— which included signing documents agreeing to payment of the inflated equity to Compassion Real Estate and Immanuel based upon what appeared to be the submission of "phony" repair or rehab invoices. Several of the straw-buyers testified that they never really read what they signed nor did they pay much or any attention to the documents. Following the settlement and often in a car outside the settlement office, the straw buyers were paid a fee anywhere from $2,000 to $6,000 for the use of their name and their credit.

The Court recalled the testimony of a couple of owners of properties on the Eastern Shore of Maryland who testified that they were delinquent in their mortgage payments and were on the verge of foreclosure of their properties, largely because the balloon payments had kicked in. These witnesses were Lawrence Deal, Carolyn Deal, and Dyna Blakley. Blakley testified that her father left her the property and that she had been initially contacted by the Defendant's associate, Shante Camper. Blakley further testified that Camper told her that he (Camper) knew someone interested in buying their property. It is clear from the evidence that the defendant saw

an opportunity to make some money on these property owners who were in a distressed situation.

With respect to the straw buyers, the evidence established that the Defendant misrepresented the true situation/relationship he was to have with the straw buyers. He told several of the straw buyers that they could make some money on real estate investments—advising them that all they had to do was put their name on the deed for a year and the Defendant would then have their names taken off. These straw buyers were then paid a fee out of the inflated equity paid to Compassion Real Estate Company or Immauel, LLC. The Court recalled that one of the straw buyers (Rubin Garvin) testified that he had been drawn into this situation by the Defendant and testified that he was upset that he had to come to court to testify and subject himself to cross examination as to personal matters involving his mother's house and her financial situation. After a while on the stand Mr. Garvin became visibly upset and was about to "lose it" but he asked for a recess from testifying on the stand, which the Court granted. Several straw buyers testified that after making a few payments, the Defendant stopped paying on the mortgage notes which resulted in collection calls by the particular mortgage lenders. Ultimately, the evidence established that the properties were lost to foreclosures and the straw buyers ended up with bad credit.

To summarize, the Court believes that with respect to this case, the evidence before the jury reflects that the Defendant was the driving force behind this scheme. The Defendant found sellers to whom he wished to make purchase offers, the Defendant caused the paperwork drafted to reflect a different and higher sales price, and the Defendant (knowing that he himself could not qualify for any or all of these loans and recruited straw buyers. The Defendant lied to the straw buyers about their status/legal relationship with the property. The evidence further

reflected that the Defendant then put the straw buyers in contact with "crooked" loan officers/brokers, told the straw buyers what to say and after the settlement, and the Defendant then paid the stray buyers for the use of their names and credit. Finally, the evidence reflected that the Defendant (via his two companies which he controlled) then took most of the money proceeds from this scheme and eventually was responsible for the property going into foreclosure as he stopped paying the mortgage payments. Clearly, there was a mound of evidence to support the jury's decision finding the Defendant guilty of wire fraud, mail fraud, money laundering, and willful failure to pay taxes for years 2004, 2005, and 2006.

Now the Court is quite mindful that without the assistance of the greed of the mortgage industry some of the damage, perhaps, could have been avoided. What is so troubling about the industry, including the (victim) banks who ended up holding the note, is that so many in the industry are contributing to the offense by giving loans to practically anyone who requested them; never really checking the loan financial statements and paperwork; never doing much more than a cursory check to determine whether were material misrepresentations, lies, and fraud on the applications; and never questioning what likely were fraudulent appraisals of the properties. Clearly, the mortgage industry itself was part of the mortgage problem and the "mess" which this country has now inherited.

### III

Based upon this summary of what the Court believes the evidence reflected, and based upon the evidence presented at the sentencing hearing together with the arguments put forth by

the parties at the sentencing, the Court was able to make several determinations and now restates those determinations in this Memorandum Opinion.  Preliminarily, the Court adopted the findings and conclusions set forth in the Revised Pre-Sentence Report issued by the assigned probation officer.  The Court reviewed all of the Defendant's objections to the presentence report and objections to the proposed calculations under the advisory guidelines.  The Court finds the objections without merit and, therefore, overrules them.  The Court believes and is satisfied that paragraphs 7-45 of the presentence report accurately describes and summarizes the evidence generated during the trial. The Court also finds that the offense involves sophisticated means, that the Defendant derived more than $1,000,000 in gross receipts from the financial institutions, and that the Defendant was an organizer and leader of a criminal enterprise that involved at least five participants and was otherwise extensive.  The Court further finds that the Government established at the sentencing hearing that the Defendant netted $892,368 from the scheme and that an order of restitution in that amount is appropriate.

Finally, while the Court does not find that the advisory guideline range in this case and the Defendant's Criminal History Category of II substantially over-represents the seriousness of the offense and the Defendant's criminal history, the Court does, however, believe that there is a basis to depart down from the advisory guideline range in this case.  The Court has considered the important need to deter others (general deterrence) which is great in this case, as well as the need to deter the Defendant (special deterrence) which is not as great.  The Court has also considered the need to avoid disparity in sentencing.  There were many others involved in this scheme who have received or will receive lesser sentences though the Court is aware that these other participants had different and arguably more minor roles.  Yet the Court has considered

other sentences it has issued over the past several years for similar conduct and recognizes the need to attempt to avoid disparities in sentencing. The Court also considers the protection of society and the nature of the offense. This certainly is a horrific offense, but the Court agrees with the Defendant that under U.SS.G section 5K2.10 (Victims Conduct) the Court can consider the circumstances by which these victims (as part of the mortgage/housing industry) contributed to the overall environment which fostered these types of offenses. As the Court previously implied earlier in this Memorandum Opinion, the industry itself including the direct victims in this case (the banks who held the delinquent mortgages) are not completely innocent but together the industry itself does share some blame in reference to the culture giving rise to these type of offenses.

At the end of the day, the Court must sentence a defendant to a sentence sufficient but not greater than necessary. The Court has considered all of the factors under section §3553 and believes that it is appropriate here to depart slightly from the advisory guideline range and sentence the Defendant to a ten year sentence of 120 months which the Court finds is sufficient and not more than necessary. The Court will issue a JUDGMENT and RESTITUTION ORDER which is consistent with its findings and conclusions.

<u>January 25, 2011</u>                                   _____/s/_____
      (Date)                                                      ALEXANDER WILLIAMS, JR.
                                                                          United States District Judge